Our next case is Pacific Biosciences v. Oxford Nanopore Technologies, 2020-2155. Mr. Reines. Thank you, Your Honor, and may it please the Court. The judgment in this case should be reversed because ONT's calculated exploitation of the COVID crisis to eliminate order violations resulted in the invalidation of two patents without clear and sufficient evidence to support the enablement verdict. Let me start with the J-MAL issue, please. Mr. Reines, are these patents what are sometimes referred to as paper patents where they've had a constructive reduction of practice by filing but no prior actual reduction of practice? That's correct, Your Honor. All right. Go ahead. So, on the J-MAL, ONT's dedicated and only expert, Dr. Goldman, admitted that the invalidated claims could be successfully performed at the critical date. Mr. Reines, this is just trying to-I'm going to interrupt you and just explore that maybe you can clarify. So, this admission is a single question and answer, and the question was specifically about 400 Claim 1. You don't distinguish 400 Claim 1 from the other claims, and 400 Claim 1 conspicuously is a claim that does not have the enzymatic control element. So, why would the admission as to 400 Claim 1 serve as an admission for all the rest of the claims, and you argue them as a group? Isn't there something self-limiting about the very admission that you rely on? Not at all. That's not an issue anyone's raised. No one suggested that the claims don't rise and the attempt by ONT is to pivot to enzyme as being not enabled. So, the fact that there's no specific limitation to that, if anything, improves the position for 400 Claim 1, whereas someone claiming that, you might say, okay, well, then there's more of an obligation to enable. But even without the-I mean, the admission's clear. I mean, at least it's the back on that. Let's assume that it was an admission that Claim 1 of the 400 was enabled. That does not imply an enablement of the other claims, which all have this other element, namely enzymatic control. If you could-it's a broader claim. So, if a broader claim is enabled then the narrower claims are enabled. And no one's made this argument. It wasn't made below. It wasn't made in the appeal briefing. But a broader claim is harder to enable. So, I just disagree with that. And there was no argument about the breadth of the claim made, but more to the point- I'm sorry, one other kind of related question. The Atkinson Grant, which I guess is at 1836. This is like a grant application. I wasn't able to tell. Was that document in the public domain at some point? And if so, when? Yes. Yes, it was prior art and it's described- It might describe prior art. I did not see in the testimony you cited asserting it as prior art. That testimony, at least when I read it, did not say this document was publicly available before, what is it, 2009 or something? Again, it is. So, that's obtainable. It's from well before then. Atkinson was asked about it and specifically acknowledged that it was describing his work from the 2005 time period. And that's when it was. And no one's made an argument that Atkinson Grant was in prior arts. We put it in our opening brief and it was undisputed items. But even if the admission wasn't clear as day, under this court's law, the two sentences of asserting that N is not enabled in calculation of N is insufficient. It's completely conclusory. It doesn't describe how much work would be taken, what people would know, why is the problem. None of that is stated. There's case after case. There's a remarkably long line of authority in this court that that kind of conclusory testimony is not good. The witness couldn't identify any evidence that supported it. He stated predictability wasn't something he testified about. It's nothing. And then in terms of a point that I want to make here is that the written description of the challenge was rejected by the jury and it was on the same theory. So the jury accepted that he, that the investors possessed the calculation of N, because that was the exact same theory, because he, the opinion on both of those decisions is the same one sentence. And that just doesn't make any sense. And really, you know, I think the record is so. This is Judge Stoll. I just, I understand your argument. I just want to make sure I understand. Now, the jury also heard an alternative reasons for why the claims were not enabled, including whether the patents enabled the Nanopore sequencing method, including use of enzymes to control translocation, right? So that's, we have to presume that the jury found that there was an enablement on that basis as well, correct? That is absolutely right. And, and what, and I have two responses on that. The first one is that wasn't argued, that wasn't adopted by their own expert. If Judge Toronto's right in the supposition for his question, if claim 400 was successfully used, that is Nanopore sequencing. So the admission of Goldman himself is inconsistent with that argument. It is an argument that was attempted to rely on an expert for the 929 patent, Dr. Herdlicka, and he repeatedly testified squarely that it was enabled. And that's, you know, 1330 through 1332, again and again, he testified that Nanopore sequencing was enabled as of 2008 and 2009. And Atkinson admitted it, specifically with enzymes, that the 1470, A1417 to 975, he has his 177 patent document from, from that Herdlicka said enabled Nanopore sequencing. And I mean, there's, there's so many different instances where he said it, but exhibit, I mean at 1331, and you just told the jury that Atkinson teaches Nanopore sequencing, correct? And you even referred, you called out helicases in specific, helicase enzymes, correct? Correct. That's what their own expert said that they're trying to pivot to for this issue. Atkinson himself, he admitted that he performed low resolution sequencing in the late 1990s because he filed a patent, the 714 patent on Nanopore sequencing in the 1990s. Come on, people. And so the 714 patent is marked on their website as protecting their product, a Nanopore sequencer. It claims Nanopore sequencing. Their own witnesses said, yes, we did low resolution Nanopore sequencing before the patent application was filed in 2000. That's at A1412, 955, 3 through 10. The 782 patent was, which was the basis for their IPR, where they claimed Nanopore sequencing was obvious and was obvious. That's in the record. That was stated to be Nanopore sequencing in the record. That's at A14219. The 503 patent was filed in 2003. That's on Nanopore sequencing. All three of these patents with different inventorship groups are listed on their website. Even today, your clerks can go and look up Oxford Nanopore and its patents, and all these Nanopore sequencing. This is a fake issue. Mr. Reines, this is a jury verdict, and the jury heard all the evidence, including that which you were arguing, and this was described as a nascent technology, and that there are no working examples here, and there's no guidance on determining N. So why shouldn't we accept all these judgments made by the jury? Because, for one thing, that's the whole purpose of JMA. I just went through, there can't be a whole litany of patents that all claim Nanopore sequencing that they're working on, that their witness experts say enable, and then say the jury could choose otherwise. It's just JMA. But I do want to focus on one thing specifically. You mentioned this issue of the patent teaches nothing about calculating N, and the district court in rote fashion repeated that, and it's untrue. They cite Atkinson for it at A140708. There's no reference to the patent at all. Atkinson just said, I didn't consider N. There's no reference at all. And then Dezimuz just said there was not a step-by-step instruction for calculating N. You calculate N empirically. You add bases on the end, and you change them up, and it's described in column 40, and you can figure it out. If you add a different base, and it shows a different level, then you know that it's affecting it. If not, not. In fact, the patent says you can figure out the percentage contributed by using this technique by each base. So the fact that this idea that this panel is going to accept that there was no reference at all to how to do it in the patent based on both Pelley and the district court statement that Atkinson and Dez support that point is vacuous. I've got limited time, unless there's more questions on this, but finding that Manafort sequencing was not at all, you know, wasn't enabled as a field in 2009 is just inconsistent. It's inconsistent with the representations of their own counsel that there was a 101 violation for the 400 patent because Manafort sequencing was conventional at the time. Please. I mean, how could that be? And I've given you a list of patents and a list of admissions from their experts point blank on this point. That's what And please look at those citations. Now, with respect to why the problem occurred, there was prejudicial misconduct here that was elaborate, central, baseless, and scary. There is a reasonable probability that scaring people that taking the Oxford Manafort product off the market would hamper the fight against COVID at the peak of the scare is outrageous. And, you know, I just, they're all, they confess to it. Mr. Ron, this is Judge Toronto. Do we have in the joint appendix, the slides that were given to you the night before, in which you got some kind of taste for what? I don't think so. But this is this opening the door argument, which No, no, no, no, no. Two separate points. Opening the door is that you planned to mention COVID or coronavirus in a passing way. But the other point was that you got slides the night before and I'm inferring from what I've been, what I've read was that those slides didn't begin to capture the extent of what was actually done by the other side at the opening argument. But I haven't laid eyes on those slides. If those slides, you know, set forth everything that the other side did at opening the next day, and you didn't object in advance, that would look a little bit different from what it would look like if you got a very small taste of it. And then a much, much more intense and lengthier harping on the coronavirus aspect was done at the actual opening argument without warning. Very good question. But this is more of the blaming the victim. You know, no, it didn't spell out any of this fantasy story about Wuhan or vaccines, or death, family, go packs. It had none of that. But I objected in the middle of the opening statement, which is an unenviable position for counsel. And, you know, we were diligent in immediately calling out outrageous lemonade violations. What's the JA site for the objecting in the way? Okay, maybe you can tell me. Yeah, rebuttal. I could handle that easily. Unless there's other questions, I'll preserve whatever you let me preserve. I do have one question. And again, I don't want to put aside this blaming the victim label. You asked for a curative instruction. The curative instruction was given. In substance, it conveys an idea that the jury is not to worry about taking things off the market. It may have been milder than one can count on the jury really taking in. What if you had asked for and the judge had considered an instruction that hammered the point home by saying, um, the question of taking this off the market, even if you find infringement and validity, is not a question for the jury. It's a question for me. And I can assure you, the jury, that I, if there is evidence that taking it off the market would do harm to public health, I will not allow it to be taken off the market. At most, Oxford would have to pay money for the use. Now, that was not given in that kind of specific form. Would that have been an alternative for you to request? Another good question. And, you know, in crafting what we did, it was a horrible situation, especially with each passing day. No, no one wants to go near this issue. And I think that record is absolutely clear on that. So we couldn't have mentioned anything getting into this was very dangerous. We came up with it as a vanilla statement that would remind the jury about the whole COVID crisis that was emerging at the time and scaring everyone. And, you know, getting, asking the judge to parse what would be the after trial release is something that I think in general, you know, people avoid. Our whole point was what the relief was after trial was not something for the jury to consider. That's why we moved to eliminate. And so we were forced into trying to make the best of the situation. What I would say is, you know, is the jury did a horrible job of following instructions in general. Just the example where they allowed, you know, where they upheld on written description and now people are saying that they found and not the calculation and not enabled, which this panel seems to even be tolerating to some degree. And, you know, they did a horrible job of following instructions. And the Draper case, which is described in the Third Circuit as the seminal case, is clear enough that the curative didn't change it. And Feynman too says the same thing. That vanilla curative was insufficient to overcome vaccine, Wuhan deaths, family, go pack and everything else. And it just comes. Is there a question been answered, Judge Toronto? Yes. Thank you. Mr. Rhinus, we will give you three minutes of rebuttal after we hear from Mr. Hawes. Thank you, Your Honor. Michael Hawes-Rox for Nanopore. I'm going to start actually where counsel for PacBio ended. I want to talk a little bit about this claim that the jury, you know, got it all wrong. It was horrible. It was sloppy. Specifically, the only reference we hear as to how the jury got it all wrong was that they rejected the written description defense. Mr. Hawes, this is Judge Toronto. I just want to say for myself, I'm not much interested in that question. Can you talk about the evidence of the unenablement that is very, such evidence as there is about the specific elements of this claim that might-of these claims-that might differentiate them from nanopore sequencing as a generic concept? Yes. And I think that's very helpful. And, you know, they have this question-answer pair, and it's on page 14 of the blue brief. And there are two things about this question-answer pair that are very important for you to know. First, it's referring to the Atkinson grant. And we'll talk about why that's important to the jury. Second, it's only talking about claim one of the 400 patent. And that's important for the very reason you noted, Judge Toronto. Although I don't remember you're actually making that point in your brief. Well, what we pointed to, Your Honor, was that the Atkinson grant goes to the testimony of Dr. Atkinson. And I'd like to move you to that because that's a very important distinction here. If you look-and our brief actually did go into detail on the question of the requirement of the enzyme. But I want to tie it in because the jury got it all tied in in testimony. And when you pull out this one-question-answer pair, you don't get that, which is what they're trying to do. But on page 1406 of the record-or of the appendix, and that's the trial record at page 934, line 17. So this is where Dr. Atkinson is asked about the specific grant applications. So if you can turn with me there. And you'll see he told the jury, this is dealing with this particular type of artificial DNA portion, a DNA hairpin. And he had told the jury, as part of this testimony-and this goes back to page 920-he told the jury, here's an article that spells it all out for you. And that was- And by the way, do you agree that this grant application was available as a public document? I don't know if it would meet public accessibility. I believe that if someone wanted to request from NIH this document, they could get it, but they might not have any reason or knowledge to do that. I mean, this wasn't an issue. We never went into evidence on that. But you could request it, Your Honor. So the grant application is about this DNA hairpin, which is an artificial known nucleus. And it's actually not DNA. And I'll show you how you know that and how the jury knew that. And if you'll turn with me, in this case, we're going into to look at specifically what the jury was told was a history of the DNA. So the jury was instructed by Dr. Acheson about how this grant fit into the whole development of DNA sequencing. So are you saying it was not a nucleic acid template? It was a nucleic acid template, Your Honor. I'm sorry. So what claim element are you focusing on that differentiates the Acheson grant that you're talking about? Your Honor, the key point is that these jury instructions required that the full scope of the claim be enabled. So what we have here is a situation where one of the claims, claim one of the 400 patents, did not have the requirement that you control the speed at which the nucleic acid moves through the nanopore. And that's critical because what that meant was you could have this one very odd experimental artificial portion of RNA, actually not DNA, that Dr. Acheson had, in fact, created this hairpin. And this is described in this historical article, which is in the appendix at page 1862. And the description of it is at 1863. And it states the approach, and I'm reading here under the section, distinguishing purine and pyrimidine segments. And it says the approach was to synthesize an SS RNA oligomer comprising 70 cytosine nucleotides followed by 30 adenine nucleotides. So this is an incredibly artificial, but it is RNA. We're not saying it's not a nucleic acid. But it was one that was created by Dr. Acheson so that he could test the one point when it changed from these 70 nucleotides to the following 30 nucleotides. The reason he did that was because he couldn't control the speed. And so he needed a way to test even when he couldn't control the speed. But the key point, and he made this in his testimony, he talks about this specifically in his testimony. Just two pages later, at page 936, he then distinguishes the problem that still existed, even given his grant. He's asked, now why was this a problem? And he's talking about the way the DNA is going through the pore. And he says, it's fast. So this is, again, appendix page 1407, 936 in the transcript, line 14. Now why was this a problem? It's fast. For a 100 nucleotide fragment, it goes through in about 300 microseconds, which is too fast to read. And how did you address that challenge? We addressed it by using enzymes. So the jury heard that, yes, there was an Acheson grant. Yes, it could do this one artificial, known portion of RNA. And you could see that one change between 70 identical nucleotides and 30 identical nucleotides. But to actually enable the full scope of this claim, and there's no question that the full scope of this claim includes actually sequencing unknown DNA, which was the whole point of having the enzyme-controlled speed, that wasn't available. So this question-answer pair that is relied upon so heavily by PacBio shows, one, very unusual. It's not unimportant, right? It helped in the research. But it certainly is not a reasonable full scope of this claim. And the jury understood that. And that's where the jury could synthesize this question-and-answer with the uncontested facts that PacBio never did any of this. The uncontested fact that 700 scientists were silent, and you could hear a pin drop when years later, Oxford actually announced they had sequenced DNA. Because the Acheson grant isn't a sequence of DNA. The Acheson grant is, if I have a known artificial portion of RNA where there's only one change between a first set of identical nucleotides and a second set of nucleotides, I can see that change. So this is the case where full scope matters. Because the fact that they have one question-answer pair as to one very specific possibility that was in the prior research for their broadest claim doesn't in any way create a JMOL with regard to the full scope of the broad claim that includes using enzymes to control the rate so that you can actually read individual bases of a true DNA sequence. So the broadness of this claim is what does it in. There's uncontested facts. There's their own internal emails where they refer to the work being done by Oxford as amazing work years after these applications are filed. There is so much that this jury could rely on in saying, when you look at the full scope of these claims, we have substantial evidence. And remember, the question here is substantial evidence. We keep hearing from the other side, well, look at this one piece and look at this other piece. But the jury got to look at the pieces that aren't being referred to by the other side. They got to look at all the uncontested facts about how they never even reached the feasibility stage. And that was admitted by their first witness. The inventor admitted that. And that's in the record and it's in the appendix on page A1104. He was asked, and so it's true, sir, that PacBio never even progressed to the feasibility phase on nanopore sequencing, correct? His answer, yes, that's true. Not that they got partway through it, not that they achieved some feasibility in some areas but not others, but that they never even attempted feasibility. So the jury, in considering this evidence, and in JMOL, what we look at is, is there any substantial evidence that would support the verdict? The judge, the district court here, went through all this evidence and said, there certainly was. And you don't analyze it by just looking at a particular question-answer pair that's highlighted by the movement. You analyze it by looking at the record as a whole. And that's the Third Circuit law and it's certainly the law that this court applies in looking at JMOLs on an issue that has so much factual underpinning as this does. Would you mind turning to the prejudicial opening? No problem, Your Honor. First of all, just as a factual matter, can you compare what you, or I don't know if it was you, but I'm using you as for your client, said during the opening to what you gave in the way of slides the night before as a preview? So, yes, I can, Your Honor. So the slides the night before did point out that we had, in our trial exhibits, this article about what was going on in Wuhan. And so there was certainly an understanding that we were going to be discussing that some of this equipment was being used. And that was the same discussion, obviously, that was in the opening by PacBio. Unlike PacBio, we didn't say that our technology may lead to a vaccine, which is what they said in their opening. But- Am I remembering correctly, their mention of coronavirus was literally either one sentence or even one line in the transcript? I believe it's- Yours went on at considerable length. We gave more details about what we were doing there. That's true, Your Honor. But on the other hand, for example, we weren't the ones who said, you know, jury, you ought to be thinking about this. And we weren't the ones who said our technology may lead to a vaccine, which is what they said. So when it comes to a question of who was telling the jury something that would kind of, you know, go right to the jury's gut or their emotion, you know, that was more them saying that their technology might lead to a vaccine than our just saying what we were using our technology for in China. But, you know, the bottom line here, of course, is- So when you said in reference to the portability of the MinION, sequencing information generated by one of these has been critical in efforts to develop a vaccine. You don't think that was conveying the point, even though you were talking about some set of viral problems, Ebola and others, having already mentioned coronavirus? I mean, coronavirus and the vaccine for it had already been mentioned by PacBio. So, you know, could that also be the thinking of the jury with regard to Ebola? Sure. Both sides had mentioned it, Your Honor. So it's a possibility. We don't know. But what we do know and what the district court pointed out was that this jury was not a jury that came to its verdict by just saying, I want this party to win. This is a jury that asked questions about the jury instructions. This is a jury- And the jury instructions on infringement, which they found in favor of PacBio. This is a jury that made very detailed decisions in its verdict, some going in favor of PacBio, some going in favor of Oxford-Nanopore. This is a jury that continued to deliberate, even when, you know, PacBio is telling us that the jury was completely overwhelmed. Well, if that were all true, why did the jury, when the Judge Stark asked them, do you want to go home? They said, no, we don't think we're going to reach a verdict. We're going to go home instead of staying late and come back tomorrow morning and keep working. This jury wanted to get it right. This jury wanted to obey the instructions. And I do think it's worthwhile. I know you kind of pushed me off this and I'll be quick with it, but this argument that finding enablement, but not finding written description shows that this jury doesn't know what they were doing. Keep in mind, this is an unusual case. This is a case where the inventor said he was trying to fool competitors with these applications, right? That's the appendix on page 1105. I wanted to write patents so that my invention could fool competitors. This jury had unusual evidence in front of them. They could have said, you know, a person of ordinary skill in the art might have been fooled, might have believed that PacBio had possessed the inventions they claimed. But that doesn't mean the person of ordinary skill in the art would actually be able to practice the full scope. And the evidence, the uncontested facts, the internal emails, the statements by the inventor on the stand, all of that evidence shows that even if they fooled the people of ordinary skill in the art into thinking that PacBio possessed these inventions, they certainly didn't enable those people to practice them themselves. Unless there are other questions, it sounds like my time is up. I hear no other questions. Thank you, Mr. Hawes. Mr. Reines will give you your three minutes. Mr. Reines, are you there? Yes. Thank you, Your Honor. Regarding the enablement issue, the attempts to explain the admission by Dr. Goldman now were not presented any other time before. And they're really an attempt to shift the burden. The clear and convincing burden was on ONT to come forward. And this would be rock bottom in this court's jurisprudence if someone that couldn't identify evidence, didn't know what test they applied, didn't consider unpredictability, and had two sentences on the topic that were conclusory that didn't address the amount of experimentation. I think Judge Lurie, your Alcon decision talked about we have to spell out how much it would take to work. Nothing. So on end, this would be rock bottom of conclusory opinion, even ignoring the flat admission. That really shouldn't be ignored for any reason. The Ackeson Grant, we went to the portions that were identified, described it from 2000 to 2005. ONTs relied on that as prior art in this case. So any denial of that is not fair whatsoever. So onto the entire field of Nanopore sequencing was, I don't know what more I can say than there's a body of patents that all claim Nanopore sequencing that people admit, claim Nanopore sequencing and their own experts repeatedly admit Nanopore sequencing was enabled. So taking documents like the word fool and using it to wave in front of the jury is not substantial evidence in the face of that. On the prejudicial misconduct issue, you know, the fact is that we lightly mentioned, because we knew they'd be mentioning it, we did not know they would violate the limine and intentionally and with calculation state that their product would be excluded at a critical moment when it was going to be able to do all these things, such as the vaccine. And, you know, the district court on that issue didn't consider, you know, seemed to impose a requirement of a mistrial request, failed to consider the calculated nature of the admission, failed to consider the closeness of the case, which is described as crucial. And, you know, I just, all I can say is to say that it was reasonably probable that the scare story influenced the jury decision, I think, is a relatively straightforward and easy one. Thank you very much. Judge Stoll, I have one question. You had said that you were going to give a site to us where you objected during opening argument. I did, and I failed to, and thank you for the prompt. A1084 at page 165, 13 through 20. I don't think there's any debate. It was preserved. And, in fact, the court found the violation obviously is preserved. Right. And if I read that correctly, there's actually no mention of COVID or coronavirus. It's about this exclusion notion in violation of the MIL generally. There wasn't a, right? If our argument isn't clear, I apologize. The issue, they didn't violate eliminate by mentioning COVID. In fact, no one knew what COVID was when eliminate was filed. That was the exclusion, that was the prejudice of arguing that it was going to be excluded. The prejudice of arguing that it was going to be, that their products couldn't be excluded was how valuable they were to the COVID. So it wasn't a violation. That's the magnifier. Right. The next day when you all back and Judge Stark, at least as I read the transcript, thought that the other side had seriously overstepped and that it was dangerous. And then he gave the curative instruction in response. So the seriousness of it, I think, was well recognized by the district court. All I can say is you look at Draper and the other cases, the vanilla instruction, which was all that was possible at that point, given the third rail issue of COVID at the point, which anyone that was there knows what was going on. There's no way that prevents this whole fake story from affecting the jury's decision. Is it reasonably probable that it influenced the verdict? Yes, for sure. Thank you, Mr. Ryder. Your argument, we appreciate the arguments of both counsel. The case is taken under submission. The honorable court is adjourned until tomorrow morning at 10 a.m.